William M. Bankston
Suzanne A. Adler
Bankston Gronning Brecht, P.C.
1127 West 7th Avenue, Suite 200
Anchorage, Alaska 99501-3301
Telephone: (907) 276-1711
Fax: (907) 279-5358
Email:  wbankston@bgbalaska.com
Email : sadler@bgbalaska.com
*Attorneys for Plaintiff Baxter Senior Living, LLC*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| BAXTER SENIOR LIVING, LLC, ) <br> an Alaska limited liability company, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> MIDLAND STATES BANCORP, INC., ) <br> an Illinois corporation, ) <br> ) <br> Defendant. ) <br> ) | Case No. **3:21-cv-00273-SLG** |

## COMPLAINT FOR DAMAGES

Plaintiff Baxter Senior Living, LLC (hereinafter "Plaintiff" or "Baxter"), by and through the undersigned counsel, brings this Complaint for Damages against Midland States Bancorp, Inc. (hereinafter "Defendant" or "Midland") and alleges as follows:

## JURISDICTION, VENUE AND PARTIES

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 as this Complaint raises a dispute between diverse parties and the matter in controversy exceeds a value of $75,000.

2. This Court has personal jurisdiction over Defendant as Defendant has engaged in continuous and systematic business activities within this State. Defendant has intentionally conducted business with Plaintiff in this State and this action arises from those contacts. As such, Defendant is subject to the general or specific personal jurisdiction of this Court.

3. Venue is proper in the District of Alaska pursuant to 28 U.S.C. § 1391(a)-(c) because a substantial part of the events or omissions giving rising to Plaintiff's claims occurred in the District of Alaska and Defendant is subject to the personal jurisdiction of this Court.

4. Baxter is an Alaska limited liability company with its principal place of business located at 2903 Doris Place, Anchorage Alaska 99517.

5. Midland is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 1201 Network Centre Drive, Effingham, Illinois 62401. Defendant may be served through its registered agent at: CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

## INTRODUCTION

6. This Complaint presents the question of whether Midland owes Baxter $603,000 due to Midland's breach of the Parties' Construction Loan Agreement. Baxter borrowed $20.1 million from Midland to finance the construction of an assisted living community for seniors in Anchorage.

7. As part of the Parties' Construction Loan Agreement, Baxter was to pay Midland an Exit Fee when the loan was paid in full, as well as a Prepayment Penalty if it was paid off prior to the end of its 60-month term. However, Baxter would not be obligated to pay the Exit Fee or Prepayment Penalty if Baxter refinanced the loan with Love Funding Corporation ("Love Funding"), Midland's HUD-lending subsidiary during the relevant time period, utilizing a HUD 223(f) loan (a type of loan for multifamily housing units and insured against default) prior to the loan's maturity date. Further, Baxter would not be obligated to pay the Exit Fee if Love Funding was unable or unwilling to refinance the loan from Midland to Baxter.

8. Baxter opened its senior living community in Anchorage in October 2019. Unfortunately, just a few months later in early March 2020, a lockdown on assisted living facilities went into effect due to the COVID-19 pandemic.

9. Thus, despite strong pre-leasing of the facility, Baxter became stuck with a building that was under 60% occupied and losing money because the building required approximately 85% occupancy or better to turn a profit. Baxter was sustained by Alaska investors that could not afford to incur losses indefinitely. Given this scenario, it became clear there was no realistic chance of Baxter qualifying to refinance its loan to Midland with HUD financing provided through Love Funding. Therefore, Baxter decided to market the facility for sale.

10. Additionally, and approximately two years into the term of the Construction Loan Agreement, Midland sold substantially all of the assets and assigned all employment

contracts of Love Funding to Dwight Capital, including their office and loan originators. Love Funding's ability to originate HUD loans was transferred to Dwight Capital, while Love Funding continued to exist for the sole purpose of servicing its existing loans. At this point Midland and Love Funding lost any plausible ability to underwrite a new HUD loan for Baxter.

11. Thus, Love Funding Corporation became unable to refinance the loan from Midland to Baxter because it could no longer originate loans. Furthermore, Love Funding Corporation could not have refinanced the loan because Baxter was nowhere close to HUD's occupancy requirements to qualify for a 223(f) refinance, due largely to the effects of the COVID-19 pandemic on the community's occupancy.

12. Notwithstanding, when Baxter sold the senior living community to a company called Sabra Health Care Holdings III, LLC (hereinafter "Sabra Health") prior to the loan's maturity date, Midland insisted upon collection of its Exit Fee despite the Construction Loan Agreement's language disallowing Midland from collecting the same. Baxter was surprised at Midland's demand and alerted Midland that only the Prepayment Penalty was applicable under the circumstances. Midland refused to negotiate, and Baxter, unable to afford to allow Midland's unlawful acts from preventing the closing of its sale to Sabra Health, paid the Exit Fee under protest.

13. Midland insisted upon collection of the Exit Fee with no legal basis to do so and despite the fact that Baxter protected Midland's interests during a tumultuous time that could have resulted in negative financial consequences to Midland. Baxter made every

payment on time to Midland and aggressively pursued the only possible path, *i.e.*, the sale to Sabra Health, that ensured Midland was completely paid off, with interest and a Prepayment Penalty (in the amount of $201,000 and not at issue in this lawsuit). Thus, a loan that could have resulted in a loss for Midland due to the effects of the COVID-19 pandemic remained a profitable venture because of Baxter's extraordinary efforts. Notwithstanding, Midland unlawfully collected the Exit Fee to which it is not entitled.

14. This Complaint seeks return of this Exit Fee, in the amount of $603,000, by way of an award of damages for Midland's breach of the express and implied terms of the Construction Loan Agreement.

## MIDLAND'S LOAN TO BAXTER

15. Between October 23, 2019 and May 1, 2021, Baxter operated a senior living community in Anchorage offering assisted living, memory care, and respite services. Residents of Baxter do not require nursing home services, nor is Baxter a nursing home, but many residents do receive assistance with various activities of daily living including walking, eating, dressing, laundry, and housekeeping services.

16. To finance the construction of Baxter's senior living community, Baxter entered into a Construction Loan Agreement with Midland. **Exhibit 1**, Construction Loan Agreement dated August 5, 2018. Under the Construction Loan Agreement, Baxter received $20,100,000 in order to build its senior living community. **Ex. 1**, at 1 ¶2.1. The maturity date for the loan was five years after execution, or August 5, 2023. *Id*., at 35.

17. Midland obtained the participation of First National Bank Alaska ("FNBA")

to assist in completing its loan to Baxter, although FNBA did not participate in Midland's unlawful collection of an Exit Fee from Baxter.

18. The Construction Loan Agreement contained two terms material to the instant dispute: (1) an Exit Fee; and (2) a HUD 223(f) Refinance Requirement (hereinafter the "HUD Refinance Requirement"). *Id*., at 15-16 ¶¶4.28, 4.38. HUD refers to the United States Department of Housing and Urban Development.

19. The Exit Fee, defined as 3% of the loan amount or $603,000, was to be paid by Baxter to Midland "[u]pon payoff of the Loan in full." *Id.*, at 15 ¶4.28. However, Midland created two exceptions to payment of the Exit Fee:

> Such Exit Fee and Prepayment Penalty shall be waived if the Borrower refinances the loan with Love Funding Corporation using an FHA mortgage insurance program. In addition, if Love Funding Corporation is unable or unwilling to refinance the Loan, or a firm commitment for FHA mortgage insurance is not issued by HUD, then the Exit Fee will not be due.

*Id.* Thus, Baxter was not obligated to pay the Exit Fee if: (1) Baxter refinanced its loan from Midland with Love Funding Corporation; or (2) Love Funding Corporation was unable or unwilling to refinance the loan. Baxter does not contest that the Prepayment Penalty was applicable.

20. The HUD Refinance Requirement obligated Baxter to "apply for and diligently pursue a HUD Section 223(f) loan in order to refinance and repay the loan . . . on or before the maturity date." *Id*., at 16 ¶4.38. HUD Section 223(f) loans insure lenders against loss on mortgage defaults, and as such, the loan from Midland to Baxter was meant

to operate as "bridge" financing that would allow Baxter to finance construction of its senior living community, then qualify for permanent or long-term financing through a HUD insured loan no later than August 5, 2023. For this reason, the loan from Midland to Baxter was also sometimes referred to as a "mini-perm."

21. When read together, the Exit Fee and HUD Refinance Requirement provisions required Baxter to pursue a refinance of its loan with a HUD 223(f) loan and strongly incentivized Baxter to do so by utilizing Love Funding because the Exit Fee and Prepayment Penalty would be waived in such event.

22. When the Construction Loan Agreement was executed, Love Funding was "the HUD lending subsidiary of Midland States Bank." **Exhibit 2**, *Dwight Capital Closes Acquisition of Love Funding*, Businesswire, August 28, 2020. Thus, the incentive created by Midland in the Construction Loan Agreement for Baxter to avoid payment of the Exit Fee was also designed to ensure that Midland, or its subsidiary, would continue to profit from its loan to Baxter while receiving insurance against default from HUD.

23. On or about August 28, 2020 (approximately two years into the five-year term of the Construction Loan Agreement), Love Funding was acquired by Dwight Capital, "one of the nation's largest and most prominent private commercial real estate lenders." *Id.*

**LOVE FUNDING'S INABILITY TO REFINANCE THE LOAN**

24. Upon information and belief, when Dwight Capital acquired Love Funding, Dwight Capital assumed all loan origination while all existing HUD loans continued to be

serviced under Love Funding's licenses. In other words, as of August 28, 2020, Love Funding only continued to exist to service its existing loans, not originate new loans.

25. Therefore, as of August 28, 2020, Love Funding became "unable or unwilling," as defined in the Construction Loan Agreement, to refinance the loan from Midland to Baxter with a HUD 223(f) loan as Love Funding was unable to originate new loans.

26. Indeed, upon information and belief, after the acquisition by Dwight Capital, Love Funding was left with a skeleton crew to service their existing loans. Upon further information and belief, none of Love Funding Corporation's remaining employees were loan originators nor were any of the remaining employees qualified or licensed to originate a HUD 223(f) loan.

27. As of August 28, 2020, Midland was prevented by the terms of the Construction Loan Agreement from seeking to collect the Exit Fee from Baxter because Love Funding was "unable or unwilling" to refinance the loan from Midland to Baxter.

28. Even if Love Funding was not acquired by Dwight Capital, or was otherwise able to originate HUD loans, Love Funding could not have refinanced the loan from Midland to Baxter because Baxter did not qualify for a HUD 223(f) loan prior to the loan's maturity date.

29. To qualify for a HUD 223(f) loan, Baxter's senior living community needed to have maintained an occupancy rate of at least 85% for the six months prior to applying for the loan. The HUD loan then takes at least another six months to close according to

HUD, but, in reality, these loans typically take nine or more months to close. In any event, this means that Baxter would have had to reach 85% occupancy and apply for the HUD loan refinance no later than August 5, 2022 (one year before the maturity date of the Construction Loan Agreement).

30. Unfortunately, due largely to the effect of the COVID 19 pandemic on assisted living communities across the United States, Baxter was nowhere close to the necessary occupancy rate required for Love Funding to have refinanced its loan with Midland under the HUD 223(f) program prior to Dwight Capital's acquisition of Love Funding (at which point, Love Funding Corporation was unable to originate any types of loans). In fact, Baxter's inability to meet an 85% occupancy rate necessary to apply for a HUD 223(f) loan was the exact reason Baxter was forced to sell its senior living community much sooner than planned.

### BAXTER SELLS ITS SENIOR LIVING COMMUNITY AND PAYS THE EXIT FEE TO MIDLAND UNDER PROTEST

31. On May 1, 2021, Baxter sold its senior living community to Sabra Health. Leading up to this sale, Midland insisted on payment of the Exit Fee and threatened to not release its mortgage or UCC filings without payment of the same. Had Midland followed through on its threat to not release its mortgage or UCC filings, then Baxter's sale to Sabra Health would have been prevented from closing.

32. In so doing, Midland insisted that "Love funding is still a Midland subsidiary, is still operating with a HUD and GNMA license . . . Dwight Capital has simply taken over

the origination for Love funding . . . All HUD loans continue to be serviced under Love Funding's license." **Exhibit 3**, Email Thread between JR Wilcox (Baxter) and Richard Kantor (Midland) dated between April 18, 2021 and April 29, 2021, at 5.

33. Upon information and belief, Love Funding does continue to exist in a much-reduced capacity to service its existing loans, but no longer has any ability to originate new loans. **Exhibit 4**, Midland States Bank, *Press Release, Midland States Bancorp, Inc. Announces Sale of Commercial FHA Origination Platform – Retains Servicing Business* (August 28, 2020). In its Press Release, Midland stated the following purpose for the sale of Love Funding: "The sale of the origination portion of Love Funding's business will reduce volatility in our earnings stream and provide capital that can be more profitably deployed into other areas of our business . . . Retaining the servicing portion of our existing portfolio will allow us to maintain the low-cost funding generated by this business and continue earning servicing income while reducing operating expenses." *Id*. at 1.

34. Therefore, in at least one public statement and in private correspondence with Baxter, Midland admitted that Love Funding Corporation could no longer originate a HUD 223(f) loan, or any loan for that matter, as of August 28, 2020. Put simply, Love Funding Corporation was "unable or unwilling" to refinance Baxter's loan with Midland, thereby rendering Midland incapable of collecting its Exit Fee.

35. Notwithstanding, and just one week prior to Baxter's scheduled closing with Sabra Health, Midland stated to Baxter in unequivocal terms: "Let me just start off by

saying, **under no conditions will we reduce or waive the exit fee**." **Ex. 3**, at 2 (emphasis added).

36. Midland took this position notwithstanding that Baxter protected Midland's interests during a tumultuous time that could have rendered Midland's loan to Baxter a loss. Baxter made every payment on time to Midland and aggressively pursued the only possible path, *i.e.*, the sale to Sabra Health, that ensured Midland was completely paid off, with interest and a Prepayment Penalty (in the amount of $201,000). Midland's loan to Baxter remained a profitable venture for Midland, during the height of the pandemic and its corresponding economic hardships, due to Baxter's efforts.

37. In responding to Midland's refusal to comply with its obligations under the Construction Loan Agreement, Baxter stated that refinance was not possible in any event because occupancy was below HUD requirements and because Baxter did "not think Midland charging the Exit Fee [was] in keeping with the letter or spirit of the provision under the loan agreement." **Ex. 3**, at 1.

38. Because time was of the essence in Baxter's sale of the senior living community to Sabra Health, Baxter responded to Midland: "Baxter cannot afford to delay closing over this issue, so we are paying the Exit Fee, but will be doing so **under protest**." *Id.*

39. Baxter then paid the Exit Fee to Midland, as part of its closing with Sabra Health, in the amount of $603,000. This money was collected by Midland in breach of the

Parties' Construction Loan Agreement and despite Love Funding's clear inability to refinance the loan from Midland to Baxter.

40. Baxter is entitled to return of its $603,000 by way of an award of damages for Midland's breach of the express and implied terms of the Construction Loan Agreement.

## COUNT I
### Breach of Contract
### (Express and Implied)

41. Plaintiff incorporates all allegations contained herein as if fully stated in this Paragraph.

42. Baxter and Midland entered into the Construction Loan Agreement with the following material terms: (1) an Exit Fee; and (2) a HUD Refinance Requirement. **Ex. 1**, at 15-16 ¶¶4.28, 4.38.

43. The Exit Fee, defined as 3% of the loan amount or $603,000, was to be paid by Baxter to Midland "[u]pon payoff of the Loan in full." *Id*., at 15 ¶4.28. However, Midland created two exceptions to payment of the Exit Fee:

> Such Exit Fee and Prepayment Penalty shall be waived if the Borrower refinances the loan with Love Funding Corporation using an FHA mortgage insurance program. In addition, if Love Funding Corporation is unable or unwilling to refinance the Loan, or a firm commitment for FHA mortgage insurance is not issued by HUD, then the Exit Fee will not be due.

*Id*. Thus, Baxter was not obligated to pay the Exit Fee if: (1) Baxter refinanced its loan from Midland with Love Funding; or (2) Love Funding was unable or unwilling to refinance the loan.

44. As of August 28, 2020, Love Funding was acquired by Dwight Capital. In public and private statements, Midland has stated that Dwight Capital has taken over all loan origination services for Love Funding and Love Funding only continued to exist to service its existing HUD loans.

45. As such, as of August 28, 2020, Love Funding was unable or unwilling to refinance Midland's loan to Baxter. And in any event, Love Funding could not have refinanced this loan because Baxter did not meet HUD's occupancy requirements for obtaining a HUD 223(f) loan.

46. Notwithstanding, when Baxter sold its senior living community to Sabra Health on May 1, 2021, Midland insisted upon collecting its Exit Fee, in the amount of $603,000. Baxter paid the Exit Fee under protest as it could not afford to allow Midland's unlawful collection of the Exit Fee to impede closing of the transaction.

47. Midland's insistence upon collection of the Exit Fee constituted a breach of the express terms of the Construction Loan Agreement, including the implied covenant of good faith and fair dealing contained therein.

48. Plaintiff has suffered damages in the amount of $603,000 because of Defendant's breach of the Construction Loan Agreement and seeks recovery of the same, as well as attorney's fees, costs, and pre- and post-judgment interest at the highest allowable rate under law.

## COUNT II
**Impossibility or Commercial Impracticability**

49. Plaintiff incorporates all allegations contained herein as if fully stated in this Paragraph.

50. Under Alaska law, when performance of the terms of a contract are impossible or commercially impracticable, then a party is discharged from their performance or obligations under the contract.

51. Here, Baxter and Midland entered into the Construction Loan Agreement with the following material terms: (1) an Exit Fee; and (2) a HUD Refinance Requirement. **Ex. 1**, at 15-16 ¶¶4.28, 4.38.

52. The Exit Fee, defined as 3% of the loan amount or $603,000, was to be paid by Baxter to Midland "[u]pon payoff of the Loan in full." *Id.*, at 15 ¶4.28. However, Midland created two exceptions to payment of the Exit Fee:

> Such Exit Fee and Prepayment Penalty shall be waived if the Borrower refinances the loan with Love Funding Corporation using an FHA mortgage insurance program. In addition, if Love Funding Corporation is unable or unwilling to refinance the Loan, or a firm commitment for FHA mortgage insurance is not issued by HUD, then the Exit Fee will not be due.

*Id*. Thus, Baxter was not obligated to pay the Exit Fee if: (1) Baxter refinanced its loan from Midland with Love Funding; or (2) Love Funding was unable or unwilling to refinance the loan.

53. As of August 28, 2020, Love Funding was acquired by Dwight Capital. In public and private statements, Midland has stated that Dwight Capital has taken over all

loan origination services for Love Funding and Love Funding only continued to exist to service its existing HUD loans.

54. As such, as of August 28, 2020, Love Funding was unable or unwilling to refinance Midland's loan to Baxter. And in any event, Love Funding could not have refinanced this loan because Baxter did not meet HUD's occupancy requirements for obtaining a HUD 223(f) loan.

55. Thus, Baxter's obligation to refinance its loan with Midland through Love Funding to avoid payment of the Exit Fee was impossible or commercially impracticable.

56. This impossibility or commercial impracticability discharged Baxter's obligations under the Construction Loan Agreement, *i.e.*, Baxter was discharged from paying the Exit Fee when it sold its senior living community to Sabra Health.

57. Notwithstanding, when Baxter sold its senior living community to Sabra Health on May 1, 2021, Midland insisted upon collecting its Exit Fee, in the amount of $603,000. Baxter paid the Exit Fee under protest as it could not afford to allow Midland's unlawful collection of the Exit Fee to impede closing of the transaction.

58. Midland's insistence upon collection of the Exit Fee was unlawful and in violation of the terms of the Construction Loan Agreement given that Baxter's ability to refinance its loan with Love Funding was impossible or commercially impracticable.

59. Plaintiff has suffered damages in the amount of $603,000 as a result of Defendant's unlawful collection of the Exit Fee despite the fact that it was impossible or commercially impracticable for Baxter to refinance its loan with Love Funding and seeks

COMPLAINT FOR DAMAGES   Page 15 of 19
Baxter Senior Living, LLC v. Midland States Bancorp, Inc., Case No. _____

Case 3:21-cv-00273-SLG   Document 1   Filed 12/22/21   Page 15 of 19

payment of the same, as well as attorney's fees, costs, and pre- and post-judgment interest at the highest allowable rate under law.

## COUNT THREE
## Violation of Alaska's Unfair Trade Practices Act (AS 45.50.471(b)(14))

60. Plaintiff incorporates all allegations contained herein as if fully stated in this Paragraph.

61. Alaska Statute 45.50.471(a) provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful."

62. Midland was engaged in the conduct of trade or commerce when it entered into a commercial transaction to provide a loan to Baxter in the amount of $20.1 million to fund the construction of a senior living facility in Anchorage, Alaska.

63. Alaska Statute 45.50.471(b)(14) provides, "The terms 'unfair methods of competition' and 'unfair or deceptive acts or practices' include the following acts . . . representing that an agreement confers or involves rights, remedies, or obligations that it does not confer or involve, or that are prohibited by law."

64. Midland's conduct in this transaction was a violation of Alaska Statute 45.50.471(b)(14).

65. Midland represented to Baxter that the parties' Construction Loan Agreement required Baxter to pay the exit fee, in the amount of $603,000.

66. Baxter was not obligated to pay the Exit Fee if: (1) Baxter refinanced its loan from Midland with Love Funding; or (2) Love Funding was unable or unwilling to refinance the loan.

67. As of August 28, 2020, Love Funding was acquired by Dwight Capital. In public and private statements, Midland has stated that Dwight Capital has taken over all loan origination services for Love Funding and Love Funding only continued to exist to service its existing HUD loans.

68. As such, as of August 28, 2020, Love Funding was unable or unwilling to refinance Midland's loan to Baxter. And in any event, Love Funding could not have refinanced this loan because Baxter did not meet HUD's occupancy requirements for obtaining a HUD 223(f) loan.

69. Thus, Baxter's obligation to refinance its loan with Midland through Love Funding to avoid payment of the Exit Fee was impossible or commercially impracticable.

70. As of August 28, 2020, Love Funding was unable or unwilling to refinance Baxter's loans, such that Baxter's payment of the $603,000 was no longer required.

71. Despite such, when Baxter sold its facility to Sabra Health on May 1, 2021, Midland insisted on the payment of the $603,000 exit fee.

72. Payment of the $603,000 exit fee was necessary to close the transaction, and therefore, Baxter paid such amount to Midland under protest. If Baxter had refused to pay the $603,000 exit fee to Midland, the sale of the facility to Sabra Health would not have closed and would have resulted in significant damages to both Baxter and Sabra Health.

73. Midland represented that the Construction Loan Agreement required payment of the $603,000 exit fee to Midland, on May 1, 2021, when such is plainly not the case.

74. Such conduct placed Baxter in a position where it was required to pay the $603,000 exit fee to Midland, despite the fact that such payment was not required by the Construction Loan Agreement, in order for the sale to Sabra Health to close.

75. Such conduct was a violation of Alaska Statute 45.50.471(b)(14), and entitles Baxter to an award of enhanced attorney's fees; treble damages; and all other remedies set forth in AS 45.50 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for entry of judgment in its favor and against Defendant as follows:

1. Plaintiff requests payment of all damages flowing from Defendant's breach of the Parties' Construction Loan Agreement in an amount not less than $603,000;

2. Plaintiff requests payment of the Exit Fee in the amount of $603,000 as its performance under the Parties' Construction Loan Agreement was excused or discharged;

3. Plaintiff requests payment of all attorney's fees and costs pursuant to any applicable statute or civil rule;

4. Plaintiff requests treble damages for Midland's violation of Alaska's Unfair Trade Practices Act (AS 45.50.*et seq*.);

5. Plaintiff requests pre- and post-judgment interest at the highest rate allowable under law; and

6. Plaintiff requests any and all other legal or equitable relief deemed appropriate by the Court.

Respectfully submitted this 21st day of December, 2021.

BANKSTON GRONNING BRECHT P.C.
Attorneys for Plaintiff Baxter Senior Living LLC


/s/ *William M. Bankston*
    Alaska Bar No. 7111024
    wbankston@bgbalaska.com


/s/ *Suzanne A. Adler*
    Alaska Bar No. 1612113
    sadler@bgbalaska.com

    1127 West 7th Avenue, Suite 200
    Anchorage, Alaska 99501
    Telephone: (907) 276-1711
    Fax: (907) 279-5358